El Juez Presidente, Señor Negrón Fernández, no intervino.

BAUTISTA SERRANO por sí y como padre con patria potestad de VICENTE SERRANO, MARGARITA SERRANO y LUIS SERRANO, demandantes y recurrentes, *v.* PUERTO RICAN CEMENT CORPORATION e INSURANCE COMPANY OF NORTH AMERICA, demandadas y recurridas; FELÍCITA SOTO y EMILIANO OQUENDO por sí y como padres con patria potestad del menor LUIS ANTONIO OQUENDO SOTO, demandantes y recurrentes, *v.* PUERTO RICAN CEMENT CORPORATION e INSURANCE COMPANY OF NORTH AMERICA, demandadas y recurridas; AMADOR OQUENDO TORRES, demandante y recurrente, *v.* PUERTO RICAN CEMENT CORPORATION, e INSURANCE COMPANY OF NORTH AMERICA, demandadas y recurridas.

*Número:* R-69-194        *Resuelto:* 16 de noviembre de 1970

*Jorge Díaz Cruz* y *Nelson Escalona Vincenty,* abogados de los recurrentes; *Juan Enrique Géigel, Guillermo Silva, Hernán G. Pesquera, E. Rodríguez Font* e *Ignacio Rivera Cordero,* abogados de las recurridas.

PER CURIAM: Un grupo de muchachos residentes de la Barriada Los Chinos contigua a los terrenos de la Ponce Cement se adentró en los terrenos de ésta para ir a jugar al tope de un monte. donde había un corte de cantera y que la prueba presentada describe como una "cueva". La parte superior de la "cueva" se desplomó sepultándolos. Solo uno salió con vida.

Las demandas radicadas contra la Puerto Rican Cement y su aseguradora fueron desestimadas.

A continuación las determinaciones de hechos que dieron base a la sentencia dictada:

"La Puerto Rican Cement Corp., es dueña de setecientas (700) cuerdas de terrenos, que forman un solo cuerpo, en el

barrio Canas de Ponce, Puerto Rico. Parte de estos terrenos se utilizan para las operaciones industriales de una fábrica de cemento, que opera desde el año 1941; y 270 cuerdas aproximadamente son canteras de donde se extrae la materia prima para la manufactura del cemento. Hay cincuenta (50) cortes de cantera abandonados.

Por el linde norte de los terrenos de la Puerto Rican Cement Corp., a la cual en adelante nos referiremos como la Puerto Rican Cement, se esparce un arrabal conocido por la 'Barriada Los Chinos' o la 'Joya Los Chinos', formado por alrededor de 300 a 400 familias, con quienes conviven cientos de niños.

La finca de la codemandada Puerto Rican Cement comienza al terminar la verja de bloques del Cementerio Civil (municipal); que tiene más de seis pies de alto.

A todo lo largo de la colindancia norte de la finca de la Puerto Rican Cement hay vestigios de una cerca o verja de alambre de púas y se extiende un callejón que sirve de acceso a la 'Barriada Los Chinos'.

Para el año 1966 dicha cerca o verja estaba bastante destruida, pero la mayor parte de sus postes de concreto continuaban erguidos. Aunque sus postes eran para doce (12) pelos de alambre, en algunos sitios, entre poste y poste, conservaban ocho pelos de alambre de púas; cinco en otros; algunos postes estaban hundidos en el terreno o derrumbados; otros sin alambres, o con indicio de que sus alambres fueron cortados, o con los alambres tirados en el suelo. Hace varios años que la verja se encuentra en malas condiciones.

Originariamente, sic, para el año 1941, los espeques que servían de sostén a los alambres de la cerca eran de madera; luego pusieron los espeques de hierro, pero se los llevaban o los destruían y, finalmente, la verja la construyeron de postes de concreto, de seis pies de altura, empotrados en una base de hormigón, separado entre sí, de seis a ocho pies.

El callejón de la Barriada Los Chinos, al adentrarse a la par con la colindancia de la finca de la Puerto Rican Cement se torna sumamente angosto. Se reduce, más bien, a una vereda intransitable para vehículos de motor. Al finalizar dicho callejón hay un talud al lado contrario al de la finca de la mencionada codemandada.

Los niños y jóvenes de la Barriada Los Chinos acostumbraban jugar dentro de los terrenos de la Puerto Rican Cement,

y era un lugar de diversión cuando llovía, ya que se formaba un lago en la explanada de la finca.

También los moradores de la Barriada en cuestión introducían sus animales a pastar dentro de la propiedad de la Puerto Rican Cement, causando la destrucción de los alambres de la verja por distintos sitios.

Los Directores de la Puerto Rican Cement estaban compenetrados de esa situación y hasta tuvieron en mente poner una cerca de 'cyclone fence', pero resultaba muy costosa.

El señor Norberto Colón, Supervisor de Seguridad de la susodicha codemandada hacía diez a once años que veía niños jugar dentro de la finca y en innumerables veces tuvo que sacarlos de allí.

No había rótulo o letrero que prohibiera el paso a la finca de la Puerto Rican Cement, o un celador que la vigilara o impidiera su entrada. Tuvieron un guardia de la Wackenhud que retiraron porque lo apedreaban.

Luis Antonio Oquendo Soto nació el 30 de junio de 1953, estaba con su mamá doña Felícita Soto González en la Barriada 'Los Chinos'; dos años atrás, había dejado la escuela elemental, a la cual asistió hasta el tercer grado, y sabía leer y escribir.

El 6 de abril de 1966, miércoles de Semana Santa, como a las 2:00 de la tarde, Luis A. Oquendo Soto, acompañado de su primo Ángel Luis Oquendo y de sus amigos Francisco Soto González, Jesús Serrano, Samuel Serrano y David Serrano decidieron ir a jugar y a tomar fresco a una cueva que queda en el tope de un monte.

Luis A. Oquendo Soto cogió hielo en un pote, de la nevera eléctrica de la casa de su abuelo, compraron refrescos y se introdujeron, sin permiso, 'por una entrada que hay por arriba', en la parte llana de la finca de la Puerto Rican Cement. Para llegar a la cueva tuvieron que subir una cuesta muy empinada y peñascosa. Dicha cueva estaba en un sector desprovisto de árboles frutales o frondosos, rodeado de terreno escarpado. En el camino no se toparon con nadie.

La prueba no precisó la ruta exacta que siguieron los jóvenes excursionistas.

El testigo Luis A. Oquendo Soto describe la cueva como un poquito más grande que la que muestran los Exhs. 1H, 1I, 1K, 1L, 1N, 2K de la demandada y Exh. 1A de los demandantes.

El hielo se había derretido; se tomaron los refrescos y empezaron a jugar dentro de la cueva tirándose arena con las manos. De súbito se desplomó el techo de la cueva. Luis A. Oquendo Soto quedó sepultado hasta el cuello con la cabeza descubierta y logró salir. Los demás que lo acompañaban, Francisco Soto González, Ángel Luis Oquendo, Jesús Serrano, Samuel Serrano y David Serrano, quedaron enterrados.

En el momento del desprendimiento Luis A. Oquendo no sintió ningún ruido. Había estado en el sitio por cuatro o cinco veces, un mes antes, acompañado por los que fallecieron y otros amigos, y notaba que caía 'tierrita del techo de la cueva' y que se metía allí el ruido de los camiones de la fábrica, cuando pasaban. No precisó por donde era que los vehículos transitaban.

Cuando Luis A. Oquendo logró salir de la cueva fue a la casa de su abuelo, don Francisco Soto Echevarría, padre de Franciso Soto González, le informó lo ocurrido y se dirigieron hacia el lugar del derrumbamiento. En el camino los alcanzó Guillermo Matos Saldaña, yerno de don Francisco Soto y padrastro de Ángel Luis Oquendo. Fueron al sitio del suceso. No vieron nada ni encontraron a nadie. Entonces Matos Saldaña, montado a caballo, fue a pedir ayuda a la planta de cemento. En el trayecto se encontró a Víctor Guadalupe González, empleado de la co-demandada de referencia, quien, en ese momento, operaba una máquina ('finger lift') y le informó lo ocurrido; fueron al lugar. Luego, el Sr. González notificó lo ocurrido al señor Norberto Colón, superintendente de cantera de la Puerto Rican Cement.

Funcionarios y empleados de la Puerto Rican Cement se personaron al sitio; se organizó e inició la labor de salvamento. Después llegó, sic, la Policía, los Bomberos y la Defensa Civil.

La ambulancia, la máquina ('finger lift') y otros vehículos sólo pudieron acercarse hasta un hectómetro aproximadamente del sitio del derrumbe, por lo escabroso que era el terreno.

El señor Guadalupe González ayudó a desenterrar cuatro (4) de los que habían quedado sepultados. Los dos primeros que desenterraron daban señales de vida y les aplicaron respiración artificial. Los enviaron en ambulancia para el hospital pero los esfuerzos resultaron infructuosos. Se aglomeró mucha gente en el sitio y usaron una soga para evitar que interfirieran con la labor de rescate. Luego de desenterrados cinco niños, se corrió el rumor de que faltaba otro. Entonces emplearon una máquina

excavadora que llegó hasta el mismo sitio del derrumbe, para remover la tierra del interior de la cueva hasta tropezar con la roca firme.

En la cueva encontraron dos potes de cristal, un pedazo de machete de 10 a 20 pulgadas de largo, una botella de Coca Cola, una camisa y dos cuchillos de cocina.

El único sobreviviente de la tragedia fue Luis .A. Oquendo Soto.

En la parte suroeste de los terrenos de la Puerto Rican Cement, o sea, en el área del desprendimiento, hubo un corte de cantera para la extracción de piedra caliza, que no se explotaba desde el año 1952, debido a la baja calidad del material, pues la piedra caliza salía contaminada con arena. Desde el año 1952, esa cantera está abandonada y sin uso. Cuando operaba, se extraía la piedra caliza haciendo un corte de cantera con una pala mecánica o tractor; una máquina trituraba la piedra, y un 'bulldozer' la empujaba hacia la parte llana, donde los camiones la recogían, ya que no podían subir.

A trescientos o cuatrocientos metros del lugar donde estaba la cueva había instalada, hacía alrededor de quince años, una estrella gigantesca, de madera, que se iluminaba para el tiempo de navidad, y resplandecía y parpadeaba. Para llegar hasta dicha estrella construyeron un camino, más bien, un sendero de tres a cuatro metros de ancho, sin pavimentar, que pasa a 40 ó 50 metros por encima de la cueva. Un tractor suavizaba este camino una vez al año. No transitaban por allí otros vehículos, que el jeep del empleado de la Puerto Rican Cement, para llegar hasta la estrella a reparar las bombillas. También hay otro camino escarpado y pedregoso que llega a la cueva, que no es transitable.

La cueva ubica en un mogote o cerro calizo de la época oligomiocena de la edad terciaria media. El terreno calizo es de naturaleza argilasea o arcillosa mostrando estratificación delgada en varios afloramientos y, específicamente en el lugar del derrumbe una interestratificación de calizas margosas, con unidades arenosas (estratos delgados de arena y de calizas), que muestra inclinación o buzamiento hacia el Sur. Consiste de un 80% de cuarzo y 20% carbonato calizo. La del camino está más lavada y es dos por ciento (2%) de arcilla y noventiocho por ciento (98%) de cuarzo.

La naturaleza petrológica o litológica del terreno señalan una alta improbabilidad de que la cueva sea el resultado de causas naturales. La condición arenosa del sitio no permite estabilidad estructural interna para la formación de una cueva. La cueva se forma por un proceso de solución, que resulta de la acción del agua (de lluvia o río).

El señor José Francisco Cadilla, Director del Programa de Geología y Recursos Económicos, y Profesor de Geología de la Universidad de Puerto Rico, el 26 de enero de 1968 examinó, por una hora, el lugar donde ocurrió el infortunado accidente; se acercó a veinte metros de la cueva, ya que no pudo entrar porque estaba cercada y tomó muestras del terreno. No tiene dudas de que es una excavación artificial, producto de la mano del hombre.

Según el geólogo mencionado, cualquier vibración o trepidación grande o pequeña, dentro del radio o área de acción en que se encuentra la cueva, puede provocar un derrumbe cuando, como en este caso, la unidad arenosa está en la base.

De la inspección ocular que se llevó a cabo surge que entrando por 'arriba', o sea, al finalizar el callejón de la Barriada Los Chinos, la cueva queda a medio kilómetro aproximadamente de dicho callejón; y para llegar a ella hay que cruzar una explanada y subir por un camino escabroso y empinado en la ladera de una colina.

Midiendo el derrotero que siguieron los participantes en la inspección ocular, el Sr. Norberto Colón encontró que habían 1233 pies hasta la cueva.

Nunca antes había ocurrido un desprendimiento en los terrenos de la Puerto Rican Cement.

La cueva no es distinguible desde la Barriada Los Chinos, debido a la topografía del terreno y a la distancia.

Los padres y familiares del sobreviviente y de los malogrados niños desconocían la existencia de la cueva. Doña Felícita Soto declaró que había visitado una cueva en los terrenos de la Puerto Rican Cement, dos o tres veces, con sus hijos Arnaldo Oquendo y Sandralea Román, pero no sabía que su hijo, Luis A. Oquendo Soto, hubiera estado en dicha cueva. Sin embargo, en la contestación número 26 a los interrogatorios que le sometieran, doña Felícita Soto respondió que su hijo Luis A. Oquendo Soto había estado dos veces en la cueva, antes del 6 de abril

de 1966, con los mismos amigos que fallecieron, por espacio de una hora y media.

Los señores Feliciano Rodríguez Plata y Roberto Palmieri, Supervisor de Cantera y Superintendente de Cantera de la Puerto Rican Cement, respectivamente, conocían el lugar donde ocurrió el accidente y habían notado una pequeña abertura; que el primero vio como un mes antes en lo alto de la loma y la describe como 'muy poca, sencilla, y el segundo, la había notado para noviembre de 1965. Estos empleados de la codemandada también vieron muchachos jugando con la arena en esos alrededores y les llamaron la atención para que se fueran de allí. La eliminación de la cueva hubiera costado cien dólares a lo sumo. La llamada cueva no era una formación natural.

Con posterioridad al derrumbe la demandada Puerto Rican Cement Corp., arregló la cerca que separa los terrenos de la Puerto Rican Cement de la Barriada Los Chinos."

Así vemos que la prueba dejó establecido, aparte de los otros hechos que no son pertinentes a la responsabilidad de las demandadas para con los demandantes, que los niños de la Barriada Los Chinos acostumbraban jugar dentro de los terrenos de la Puerto Rican Cement, que los empleados de la demandada conocían de esta situación y la firma tuvo en mente poner una cerca pero resultaba muy costosa; que los empleados de la demandada sacaban a los niños que penetraban en los terrenos de la demandada; que la cueva donde ocurrió el accidente se formó al extraer material para la fábrica de cemento, que los supervisores de cantera de la Puerto Rican Cement habían observado varios meses antes del accidente una pequeña abertura en lo alto de la loma; que el terreno es arenoso y que la eliminación de la cueva hubiera costado cien dólares a lo sumo. Se estableció además que los padres de los muchachos no conocían de la existencia de la cueva.

En *Díaz* v. *Central Lafayette*, 66 D.P.R. 827 (1947) ratificado en *Vargas Rodríguez* v. *Fuentes Fluviales*, 86 D.P.R. 104 (1962), establecimos que el dueño de terrenos

es responsable de los daños sufridos por los niños que penetren en éstos, si concurren ciertas circunstancias, independientemente del hecho de que sean intrusos. Para establecer la responsabilidad, adoptamos las normas generalmente aceptadas, expuestas en la Sec. 339 del *Restatement* sobre *Torts*. Son las siguientes:

"Un poseedor es responsable de daños personales recibidos por niños que entran sin permiso en su propiedad, causados por una estructura u otra condición artificial que él mantenga en el terreno, si

(a) el sitio donde se mantiene la condición es uno que le consta al poseedor o que le debe constar que está sujeto a transgresión por los niños; y

(b) la condición es una respecto de la cual el poseedor sabe o debe saber y comprende o debe comprender que envuelve un irrazonable riesgo de muerte o grave daño corporal para tales niños; y

(c) los niños, debido a su edad, no descubren la condición o no comprenden el riesgo envuelto en intervenir con ella o en invadir el área que se tornó peligrosa debido a tal condición; y

(d) la utilidad que recibe el dueño proveniente del mantenimiento de tal condición resulta pequeño si se compara con el riesgo que la misma envuelve para los niños; y

(e) el poseedor omite ejercitar el cuidado razonable para eliminar el peligro o de otra forma proteger los niños."

En el caso de autos están presentes todas las circunstancias antes enunciadas.

(a) La demandada tenía conocimiento de que los niños penetraban en sus terrenos para jugar.

(b) Dada la formación artificial de la cueva y la clase de terreno de que estaba formada, así como la grieta que tenía en la parte superior, necesariamente esta cueva era un lugar peligroso para los niños. El tribunal sentenciador expresa que "La cueva era un lugar extremadamente peligroso para jugar dentro de ella. El peligro estaba en su conformación geológica debido, especialmente, a la unidad arenosa de su base, con buzamiento o inclinación hacia el sur."

(c) Los muchachos dada su edad, fluctuaban entre los 9 y 14 años, no podían darse cuenta de lo peligroso que resultaba jugar en la cueva.

(d) El mantener la cueva no representaba beneficio alguno para la demandada.

(e) Ciertamente la demandada omitió ejercitar el cuidado razonable para eliminar el peligro. Con un gasto no mayor de $100 se hubiera eliminado la cueva. El hecho de que los empleados de la demandada sacaran a los niños que penetraban en los terrenos de ésta, no la exonera de responsabilidad ya que no se demostró que se les advirtió del peligro que representaba jugar en la cueva. Prosser, *Torts*, pág. 262 (3a. ed.).

Como expresó el tribunal sentenciador en sus conclusiones de derecho:

"Para los niños y adolescentes de la Barriada Los Chinos, que carecen de las facilidades más elementales para su recreación, la explanada de la finca de la demandada Puerto Rican Cement es el lugar más accesible y adecuado para practicar deportes y jugar. Sobrevivir acorralados en un arrabal no es culpa de ellos. Difícilmente se le puede reprochar a los niños de la Barriada Los Chinos que entren a la finca de la demandada a jugar.

Naturalmente, que la cueva era un sitio que, una vez descubierta, a niños de las edades de los hermanos Serrano inducía a visitarla y forjar dentro de ella un sinnúmero de aventuras imaginarias."

En *Salvá Matos* v. *A. Díaz Const. Corp.*, 95 D.P.R. 902, 908 (1968), expresamos:

"En este caso de *Ramos*, un estudio exhaustivo del Juez Córdova Dávila, dijimos, (pág. 355): 'Si el dueño de la propiedad tiene motivos fundados para anticipar la presencia de niños al establecer una condición peligrosa, su deber es adoptar precauciones adecuadas y razonables para evitar daños y salvar su responsabilidad. No importa que el niño sea un intruso. No es necesario, por lo tanto, que haya sido inducido por el peligro a penetrar en la propiedad. *Basta con que haya podido*

*anticiparse razonablemente su presencia.*' Aceptamos expresamente de la doctrina la norma de 'que si hubo razón para anticipar la presencia de niños, no tiene importancia la forma y manera en que el niño lesionado vino a la propiedad.' " (Énfasis en el original.)

Ver además: *Díaz Colón* v. *Autoridad de Tierras*, 96 D.P.R. 42 (1968); *Nieves Cruz* v. *Cruz Águila*, 85 D.P.R. 230 (1962); *Pérez Vázquez* v. *Sucn. Amill*, 89 D.P.R. 370 (1963).

█ Ciertamente la demandada fue negligente en mantener una situación peligrosa, donde tenía conocimiento que frecuentaban niños a jugar.

*Procede revocar la sentencia que dictó el Tribunal Superior, Sala de Ponce y devolver el caso para la determinación de los daños.*

El Juez Presidente Señor Negrón Fernández no intervino al igual que los Jueces Asociados Señores Pérez Pimentel, Hernández Matos y Martínez Muñoz.